## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DIAGNOSTIC AND INTERVENTIONAL SPINAL CARE OF LOUISIANA, INC. d/b/a AVALA SPINE and COMPOUNDING PHARMACIES OF LOUISIANA, INC. d/b/a PROFESSIONAL ARTS PHARMACY,<br><br>      **Plaintiffs,**<br><br>v.<br><br>**UNITEDHEALTH GROUP INCORPORATED, OPTUM, INC., and CHANGE HEALTHCARE INC.**<br><br>      **Defendants.** | **Case No. 2:24-cv-01011**<br><br>**COMPLAINT–CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Diagnostic and Interventional Spinal Care of Louisiana, Inc. d/b/a AVALA Spine and Compounding Pharmacies of Louisiana, Inc. d/b/a Professional Arts Pharmacy (collectively, "Plaintiffs") bring this Class Action Complaint against Defendants UnitedHealth Group Incorporated ("UHG"), Optum, Inc. ("Optum"), and Change Healthcare Inc. ("Change") (collectively, "Defendants"), and allege the following based upon personal knowledge, information and belief, and investigation of counsel:

### NATURE OF THE ACTION

1.     A healthcare technology company must, above all else, protect the highly sensitive personal, medical, and financial information that it processes and maintains. When such a company establishes itself as the leading supplier of vital infrastructure for administering healthcare across the country and recognizes that the "healthcare system, and how payers and providers interact and transact, would not work without" it, the company must be at the absolute forefront of data security

to ensure that cyber criminals could *never* access the data the company has collected and consequently derail the healthcare industry. It cannot fail to patch critical software effectively and promptly, especially when fixes are available, and even more so when the company is aware that it is peculiarly susceptible to cyberattack. If a data breach involving billions of records of innocent customers occurs, a healthcare technology company must *immediately and accurately* notify all those affected to prevent further harm and allow users to take measures to ensure the continuity of patient care and the viability of their businesses. And it must take immediate steps to mitigate the damages it has caused—not half-steps that could lead to self-enrichment. This lawsuit stems from Defendants' abject failure to follow these simple rules.

## PARTIES

2.     Plaintiff Diagnostic and Interventional Spinal Care of Louisiana, Inc. d/b/a AVALA Spine is incorporated under the laws of the State of Louisiana and maintains its principal place of business in Covington, Louisiana.

3.     Plaintiff Compounding Pharmacies of Louisiana, Inc. d/b/a Professional Arts Pharmacy is incorporated under the laws of the State of Louisiana and maintains its principal place of business in Lafayette, Louisiana.

4.     Defendant UnitedHealth Group Incorporated is incorporated under the laws of the State of Delaware and maintains its principal place of business in Minnetonka, Minnesota.

5.     Defendant Optum, Inc. is incorporated under the laws of the State of Delaware and maintains its principal place of business in Eden Prairie, Minnesota.

6.     Defendant Change Healthcare Inc. is incorporated under the laws of the State of Delaware and maintains its principal place of business in Nashville, Tennessee.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Plaintiffs and Defendants are citizens of different states. The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 putative class members. This Court has supplemental jurisdiction over the state law claims asserted under 28 U.S.C. § 1367.

8.      This Court may exercise jurisdiction over Defendants because they have sufficient minimum contacts in Louisiana and intentionally avail themselves of the markets within Louisiana by regularly conducting business in this State, including through the promotion, marketing, and sale of their services and products.

9.      Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred within this District.

## FACTUAL ALLEGATIONS

10.     Plaintiff AVALA Spine provides minimally invasive spine procedures to patients in a patient and family-centered, multidisciplinary center. Plaintiff Professional Arts Pharmacy is an industry leader in specialized pharmacy solutions that works with patients, doctors, insurers, and pharmaceutical manufacturers to help patients access the medications they need. Plaintiffs rely on Defendant Change's services daily to administer care and to secure payment for care rendered.

11.     Change is a healthcare technology company that supplies critical services "to make clinical, administrative and financial processes simpler and more efficient for payers, providers and consumers."[1] Among these services, its platform facilitates patient insurance verifications,

---

[1]     UNITEDHEALTH GROUP, *Information on the Change Healthcare Cyber Response*, https://www.unitedhealthgroup.com/ns/changehealthcare.html (last visited Mar. 27, 2024).

clinical information exchanges, provider claim transmittals and payment disbursements, pharmacy claim transactions, and prior authorizations and medical necessity reviews.

12.    Healthcare providers use Change's services either through a direct contractual relationship or indirectly through third-party intermediaries. Change represents to providers that its "advanced technology and services help . . . enhance patient engagement and access, improve outcomes, drive revenue performance, and improve operational efficiency." And it promises patients that its "solutions streamline the engagement, care, and payment experience to improve the patient journey."

13.    Change operates the country's largest electronic data interchange (EDI) clearinghouse, connecting "approximately 900,000 physicians, 118,000 dentists, 33,000 pharmacies, 5,500 hospitals, and 600 laboratories," processing 15 billion transactions annually, and touching over 50 percent of medical claims. Change has established itself as a vital link between providers and insurers, reportedly acknowledging that the "healthcare system, and how payers and providers interact and transact, would not work without Change Healthcare."[2]

14.    Change was an independent entity before UnitedHealth Group proposed a merger with its subsidiary, Optum, in 2021. The American Hospital Association (AHA) expressed concerns about the merger, partly because it "would produce a massive consolidation of competitively sensitive healthcare data and shift such data from Change Healthcare, a neutral third party, to Optum."[3] The Department of Justice (DOJ) expressed concerns over the acquisition too. It filed a complaint to stop the transaction, noting that Change "has access to a vast trove of

---

[2] Complaint at 12, *United States v. UnitedHealth Group Incorporated*, Case No. 1:22-cv-00481, 2022 WL 576918 (D.D.C. Feb. 24, 2022).
[3] Letter from Melinda Reid Hatton, General Counsel, American Hospital Association, to Richard Powers, Acting Assistant Attorney General, U.S. Department of Justice (Mar. 17, 2021), https://www.aha.org/lettercomment/2021-03-17-aha-urges-doj-investigate-unitedhealth-groups-acquisition-change#:~:text=The%20proposed%20acquisition%20also%20would,Optum%2C%20a%20subsidiary%20of%20UHG. (last visited Mar. 27, 2024).

competitively sensitive claims data that flows through its EDI clearinghouse—over a decade's worth of historic data as well as billions of new claims each year."[4]

15.    In the regular course of business, Change captures and maintains the claims data flowing through its pipeline. This data includes names, social security numbers, email addresses, mailing addresses, payment information, transaction histories, medical, dental, and insurance records, and beyond.

16.    Considering Change's critical infrastructure that providers and payers depend on, its representations as to its vast involvement in the healthcare industry, and its creation, collection, and maintenance of highly sensitive data, Defendants are required to maintain the utmost security of its systems.

17.    Change understood its obligation to prioritize data security, as its privacy policy provides: "[w]e implement and maintain organizational, technical, and administrative security measures designed to safeguard the data we process against unauthorized access, destruction, loss, alteration, or misuse. These measures are aimed at providing on-going integrity and confidentiality of data, including your personal information."[5] As a sophisticated business entity, making promises that its systems were safe and secure, Change knew it needed to adequately protect those systems. It failed to do so.

18.    On February 21, 2024, UHG first disclosed that Defendants failed to prevent "the most significant and consequential cyberattack on the U.S. health care system in American history" (the "Attack").[6] Although UHG initially blamed a nation-state actor, it later announced that the

[4] Complaint at 5, *United States v. UnitedHealth Group Incorporated*, Case No. 1:22-cv-00481, 2022 WL 576918 (D.D.C. Feb. 24, 2022).
[5] CHANGE HEALTHCARE, *Security and Data Retention*, https://www.changehealthcare.com/privacy-notice (last visited Apr. 2, 2024).
[6] Letter from Richard J. Pollack, President/CEO, American Hospital Association, to Senators Ron Wyden and Mike Crapo (Mar. 13, 2024), https://www.aha.org/system/files/media/file/2024/03/aha-urges-more-congressional-action-to-help-providers-affected-by-change-healthcare-cyberattack--3-13-2024.pdf (last visited Mar. 27, 2024).

Attack was perpetrated by a cybercrime group known as "BlackCat/ALPHV."[7] According to reports, Defendants allowed the cybercriminals to infiltrate and encrypt Change's inadequately secured systems and data by exploiting the many weaknesses within Change's infrastructure, including outdated software, misconfigured settings, and unpatched systems.

19.     Prior to the Attack, on February 19, 2024, ConnectWise issued a security advisory specifically warning users, including Defendants, of a remote code execution (RCE) flaw that could be leveraged to bypass authentication in ScreenConnect servers. ConnectWise advised users to patch their ScreenConnect servers immediately against the "critical vulnerability" to prevent RCE attacks and recommended installing updates as emergency changes or as soon as possible.

20.     UHG filed a Form 8-K report with the Securities Exchange Commission, stating:

**Item 1.05. Material Cybersecurity Incidents.**

On February 21, 2024, UnitedHealth Group (the "Company") identified a suspected nation-state associated cyber security threat actor had gained access to some of the Change Healthcare information technology systems. Immediately upon detection of this outside threat, the Company proactively isolated the impacted systems from other connecting systems in the interest of protecting our partners and patients, to contain, assess and remediate the incident.

The Company is working diligently to restore those systems and resume normal operations as soon as possible, but cannot estimate the duration or extent of the disruption at this time. The Company has retained leading security experts, is working with law enforcement and notified customers, clients and certain government agencies. At this time, the Company believes the network interruption is specific to Change Healthcare systems, and all other systems across the Company are operational.

During the disruption, certain networks and transactional services may not be accessible. The Company is providing updates on the incident                                                    at

---

[7] *UnitedHealth says 'Blackcat' ransomware group behind hack at tech unit*, REUTERS (Feb. 29, 2024), https://www.reuters.com/technology/unitedhealth-confirms-blackcat-group-behind-recent-cyber-security-attack-2024-02-29/ (last visited Apr. 12, 2024).

https://status.changehealthcare.com/incidents/hqpjz25fn3n7. Please access that site for further information.

As of the date of this report, the Company has not determined the incident is reasonably likely to materially impact the Company's financial condition or results of operations.[8]

21.     Change subsequently disconnected more than 100 services, creating a national crisis for the healthcare industry, and severely impacting the financial security of providers throughout the country. The unavailability of Change's mission-critical services resulted in unpaid claims, overdue payments, interest accumulation, inability to perform eligibility verifications leading to loss of services, increased administrative costs caused by manual processes, negative credit impact, and other harms to Plaintiffs AVALA Spine and Professional Arts Pharmacy, and to providers across the country. Meanwhile, Change "and its parent entities benefit financially, including by accruing interest on potentially billions of dollars that belong to health care providers."[9]

22.     On March 13, 2024, the American Hospital Association (AHA) wrote to Senators Ron Wyden and Mike Crapo about the significant consequences endured by providers. According to the AHA, "downed systems are hampering providers' ability to verify patients' health insurance coverage, process claims and receive payment from many payers, exchange clinical records with other providers, provide cost estimates and bill patients, and, in some instances, access the clinical guidelines used in clinical decision support tools and as part of the prior authorization process."[10] The letter further explained that the "staggering loss of revenue means that some hospitals and

[8] EDGAR Company Search Results, UnitedHealth Group Inc., https://www.sec.gov/edgar/browse/?CIK=0000731766 (last visited Apr. 2, 2024) (emphasis in original).
[9] Letter from Richard J. Pollack, President/CEO, American Hospital Association, to the Honorable Xavier Becerra, Sec'y, U.S. Department of Health and Human Services (Feb. 26, 2024), https://www.aha.org/lettercomment/2024-02-26-aha-letter-hhs-implications-change-healthcare-cyberattack (last visited Apr. 2, 2024).
[10] Letter from Richard J. Pollack, President/CEO, American Hospital Association, to Senators Ron Wyden and Mike Crapo (Mar. 13, 2024), https://www.aha.org/system/files/media/file/2024/03/aha-urges-more-congressional-action-to-help-providers-affected-by-change-healthcare-cyberattack--3-13-2024.pdf (last visited Mar. 27, 2024).

health systems may be unable to pay salaries for clinicians and other members of the care team, acquire necessary medicines and supplies, and pay for mission critical contract work in areas such as physical security, dietary and environmental services."[11]

23.    In response to an AHA survey of hospitals with nearly 1,000 responses collected between March 9, 2024 and March 12, 2024, 60 percent reported a revenue impact of $1,000,000 or more per day.[12]

24.    Providers have shared their personal experiences with news sources. Like Plaintiffs AVALA Spine and Professional Arts Pharmacy, other providers have noted extraordinary reductions in cash flow and the lack of any meaningful workarounds. One owner of a primary care practice outside of Philadelphia has reported watching insurance payments dwindle by the day. While her practice typically generates $20,000 to $70,000 a day in deposits, it received a record low of $1,600 on Tuesday, February 27, 2024, six days after the Attack.[13]

25.    Like many others, Dr. Purvi Parikh, an allergist and immunologist with a private practice in New York City, reported to CNBC that her practice has not been able to receive reimbursements for services rendered, which makes it difficult to pay operational expenses like supplies and payroll.[14] According to Dr. Parikh, there were no immediate workarounds and switching to a new platform could take weeks.[15] "The most frustrating part is that nobody has any answers or solutions," Dr. Parikh said.

---

[11] *Id.*
[12] James Rundle and Catherine Stupp, *Change Healthcare Attack: What You Need to Know*, WALL STREET JOURNAL PRO (Mar. 27, 2024 12:25 PM ET), https://www.wsj.com/articles/change-healthcare-hack-what-you-need-to-know-45efc28c?st=71s1hpcxdx4qcib&reflink.
[13] *See* Dan Diamond and Daniel Gilbert, *Officials rush to help hospitals, doctors affected by Change Healthcare hack*, THE WASHINGTON POST (Mar. 5, 2024), https://www.washingtonpost.com/health/2024/03/05/change-healthcare-insurance-hack-hhs-plan/.
[14] Ashley Capoot, *Outages from Change Healthcare cyberattack causing financial 'mess' for doctors*, CNBC (Feb. 29, 2024 5:13 PM EST), https://www.cnbc.com/2024/02/29/change-healthcare-cyberattack-has-caused-financial-mess-for-doctors.html.
[15] *Id.*

26.     According to Mary Mayhew, president of the Florida Hospital Association, her members built "sophisticated systems that are reliant on Change Healthcare," and changing processes could take around 90 days during which they will have no cash flow. "It's not like flipping a switch," Mayhew said.[16] The AHA echoed this concern, stating that "replacing previously electronic processes with manual processes has often proved ineffective and is adding considerable administrative costs on providers, as well as diverting team members from other tasks."[17]

27.     Like Plaintiff Professional Arts Pharmacy, providers nationwide have been unable to fulfill or process prescriptions through patients' insurance or manufacturer coupon programs.[18] Of course, a decrease in prescription processing results in revenue loss for pharmacists and other healthcare providers. Ultimately, the Attack and resulting shutdown of Change's services has "crippled revenue flow in the healthcare sector" and "pushed many medical providers to the brink of closure."[19]

28.     Importantly, the Attack was a foreseeable risk that Defendants failed to prevent or even mitigate. Defendants' cybersecurity practices and policies were inadequate and fell short of the industry-standard measures that should have been implemented long before the Attack

---

[16] Darius Tahir, et al., *Health industry struggles to recover from cyberattack on a unit of UnitedHealth*, WAMU (Mar. 9, 2024), https://wamu.org/story/24/03/09/health-industry-struggles-to-recover-from-cyberattack-on-a-unit-of-unitedhealth/.

[17] Letter from Richard J. Pollack, President/CEO, American Hospital Association, to Senators Ron Wyden and Mike Crapo (Mar. 13, 2024), https://www.aha.org/system/files/media/file/2024/03/aha-urges-more-congressional-action-to-help-providers-affected-by-change-healthcare-cyberattack--3-13-2024.pdf (last visited Mar. 27, 2024).

[18] For example, Tricare, the health insurance provider for active U.S. military personnel, stated that the disruption was "impacting all military pharmacies worldwide and some retail pharmacies nationally." Tricare, Patient Portal Outages, https://tricare.mil/GettingCare/VirtualHealth/SecurePatientPortal/PatientPortalOutages (last visited Apr. 2, 2024).

[19] James Rundle and Catherine Stupp, *Change Healthcare Attack: What You Need to Know*, WALL STREET JOURNAL PRO (Mar. 27, 2024 12:25 PM ET), https://www.wsj.com/articles/change-healthcare-hack-what-you-need-to-know-45efc28c?st=71s1hpcxdx4qcib&reflink.

occurred, especially considering their knowledge that the healthcare industry is one of the most targeted sectors for cyberattacks.

29.     Defendants knew or should have known that Change was particularly susceptible to a cyberattack. Government bodies have been alerting the healthcare industry about cybersecurity threats for years due to the massive repositories of confidential personal health information ("PHI") and personally identifiable information ("PII") that organizations collect and maintain and urging entities to secure and protect their systems. As early as 2014, for example, the Federal Bureau of Investigation (FBI) warned healthcare stakeholders that it had "observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining [PHI] and/or [PII]."[20]

30.     The FBI reported 249 ransomware attacks in the healthcare industry in 2023. And the United States government specifically advised that Blackcat has compromised over 70 organizations since December 2023, with the majority being healthcare organizations.

31.     Notably, the UHG family is no stranger to data breaches. In May 2023, United Healthcare, part of the UHG conglomerate, experienced a data breach through a credential stuffing attack on their mobile app.[21]

32.     A ransomware fact sheet published by the Department of Health and Human Services (HHS) in 2017 clarified for entities covered by the Health Insurance Portability and Accountability Act (HIPAA) that "[w]hen electronic protected health information (ePHI) is encrypted as the result of a ransomware attack, a breach has occurred because the ePHI encrypted

---

[20] FBI Liaison Alert System #A-000039-TT (Aug. 19, 2014), https://publicintelligence.net/fbi-targeting-healthcare/#:%7E:text=FBI%20Liaison%20Alert%20System%20%23A%2D000039%2DTT&text=The%20FBI%20is%20providing%20the,Personally%20Identifiable%20Information%20(PII) (last visited Apr. 2, 2024).
[21] Steve Adler, *Credential Stuffing Attack Exposed United HealthCare Member Data*, THE HIPAA JOURNAL (May 2, 2023), https://www.hipaajournal.com/credential-stuffing-attack-exposed-united-healthcare-member-data/ (last visited Apr. 2, 2024).

by the ransomware was acquired (i.e., unauthorized individuals have taken possession or control of the information), and thus is a 'disclosure' not permitted under the HIPAA Privacy Rule."[22]

33.     HIPAA defines a breach as "[t]he acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI."[23] Consequently, a ransomware attack like the February 21, 2024, Attack is a breach under HIPAA because there was access of PHI unpermitted under the Privacy Rule.

34.     Such attacks are also considered "Security Incidents" under HIPAA, which encompasses "the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system." 45 CFR § 164.304. According to HHS, "[t]he presence of ransomware (or any malware) on a covered entity's or business associate's computer systems is a security incident under the HIPAA Security Rule."[24]

35.     Data breaches are preventable. Ransomware is primarily spread via email phishing, with other methods including brute force attacks on vulnerable remote desktop protocol ports. To mitigate this, organizations must train employees on handling suspicious emails, disable macros, avoid plain text password storage, and proactively search their networks for any abnormal activities.

36.     According to the FBI, phishing schemes designed to induce individuals to reveal personal information, like network passwords, were the most common type of cybercrime in 2020, with such incidents nearly doubling in frequency between 2019 and 2020.[25] According to Verizon's

---

[22] Health Information Privacy, Fact Sheet: Ransomware and HIPAA, U.S. DEPT. OF HEALTH AND HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity/ransomware-fact-sheet/index.html (last visited Apr. 2, 2024).
[23] *Id*.
[24] *Id*.
[25] 2020 Internet Crime Report, FBI, https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf (last visited Mar. 1, 2024).

2021 Data Breach Investigations Report, 43% of breaches stemmed from phishing and/or pretexting schemes.[26]

37.     The risk of cybercrime is so acute for healthcare providers that on October 28, 2020, the FBI, HHS, and the Cybersecurity and Infrastructure Security Agency (CISA) published a "Joint Cybersecurity Advisory" warning that they had "credible information of an increased and imminent cybercrime threat to U.S. hospitals and healthcare providers" and imploring providers to take "timely and reasonable precautions to protect their networks from these threats."[27] The CISA guidance provided ransomware prevention best practices, as well as a ransomware response checklist.

38.     Accordingly, Defendants were or certainly should have been aware of the high risk of cyberattacks given the massive repositories of PHI and PII they manage, and therefore, should have taken all reasonable precautions to prevent such incidents. Defendants were also cognizant of the risks created by their substandard data security practices and insecure computer networks. Their failure to heed warnings, adequately secure their networks, and adhere to recommended best practices caused the disruption and damages suffered by Plaintiffs and Class members. Defendants' neglect is inexcusable.

## **CLASS ACTION ALLEGATIONS**

39.     Plaintiffs bring this action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure individually and on behalf of all members of the following Class of similarly situated persons:

---

[26] 2021 DBIR Master's Guide, VERIZON, https://www.verizon.com/business/re ces/reports/dbir/2021/masters-guide/ (last visited Mar. 1, 2024).
[27] Ransomware Activity Targeting the Healthcare and Public Health Sector, Joint Cybersecurity Advisory, https://us-cert.cisa.gov/sites/default/files/publications/AA20-302A_Ransomware%20_Activity_Targeting_the_Healthcare_and_Public_Health_Sector.pdf (last visited Mar. 1, 2024).

All healthcare providers within the United States of America who have suffered delays in processing claims and revenue cycle services by Defendants from February 21, 2024 to the present.

40.     Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, any entity in which Defendants have a controlling interest, all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out, any and all federal, state, or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsel, and/or subdivisions, and all judges presiding over this matter or assigned to hear any aspect of this litigation, along with judicial clerks and staff, and immediate family members.

41.     Plaintiffs reserve the right to modify or amend the foregoing Class definition before the Court determines whether certification is appropriate.

42.     This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure 23 because there is a well-defined community of interest in the litigation and membership in the proposed Class is readily ascertainable.

43.     **Numerosity**: A class action is the only available method for the fair and efficient adjudication of this controversy. The members of the Class are so numerous and geographically dispersed that individual joinder of all Class Members is neither practicable nor possible. Plaintiffs are informed and believe and, on that basis, allege that the total number of Class Members is in the thousands. Membership in the Class will be determined by analysis of Defendants' records.

44.     **Commonality**: Consistent with Rule 23(a)(2) and with Rule 23(b)(3)'s predominance requirement, Plaintiffs and Class Members share a community of interest in that there are numerous common questions and issues of law and fact which predominate over any questions and issues solely affecting individual members, including, but not necessarily limited to:

a.  Whether Defendants owed a duty to Plaintiffs and Class Members to safeguard the information systems targeted in the Cyberattack;

b.  Whether Defendants knew or should have known of the susceptibility of their information systems to an attack;

c.  Whether Defendants were negligent in maintaining, protecting, and securing their information systems;

d.  Whether Defendants were negligent in failing to adequately monitor, audit, and repair the information systems;

e.  Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Cyberattack to occur;

f.  Whether Defendants failed to notify Plaintiffs and Class Members as soon as practicable and without delay after the Cyberattack was discovered;

g.  Whether Defendants failed to take reasonable and prudent security measures with respect to their information systems;

h.  Whether Defendants' security measures to protect its systems were reasonable in light of known legal requirements;

i.  Whether Defendants failed to comply with applicable laws, regulations, and industry standards related to their information systems;

j.  Whether Defendants failed to comply with their own policies and procedures related to their information systems;

k.  Whether Defendants violated federal statutes including, but not limited to, HIPAA and FTCA;

l. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to prevent or respond to the Cyberattack;

m. Whether Defendants knew or should have known that their information systems and monitoring processes were deficient;

n. Whether Defendants' conduct, including its alleged failure to act, resulted in or was the proximate cause of the Cyberattack; and

o. Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

45. In the alternative, Plaintiffs seek certification under Rule 23(c)(4) with respect to one or more of the above issues or such other issues as may be identified in the future.

46. **Typicality**: Plaintiffs' claims are typical of the claims of the Class. As the result of Defendants' common course of conduct in violation of state and federal laws and industry standards, as alleged herein, Plaintiffs sustained damages akin to damages sustained by all Class Members, including financial loss caused by Defendants' failure to timely and adequately process and pay amounts due and owing to Plaintiffs and Class Members for their medical services, and other harm caused by the disruption to Defendants' networks and transactional services.

47. **Adequacy of Representation**: Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of each of the Class because they are a member of the Class and are committed to pursuing this matter against Defendants to obtain relief for the Class. Plaintiffs are not subject to any individual defense unique from those conceivably applicable to other Class Members or the Class in its entirety. Plaintiffs anticipate no management difficulties in this litigation. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' Counsel is competent

and experienced in litigating class actions. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

48.    **Predominance and Superiority**: Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation predominate over individual issues. The issues discussed above in regard to commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class-action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class Members are relatively small compared to the burden and expense required to individually litigate their respective claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also burden and unreasonably strain the court system and would result in undue delay. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class-action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

49.    **Ascertainability**: The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. Defendants have access to names in combination with addresses and/or e-mail addresses of Class Members affected by the Attack.

50.     **Injunctive and Declaratory Relief**: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to Class Members, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate concerning the Class in its entirety. Defendants' policies and practices challenged herein apply to and affect Class Members uniformly. Plaintiffs' challenge of these policies and procedures hinges on Defendants' conduct concerning the Class in its entirety, not on facts or law applicable only to Plaintiffs. Unless a Class wide injunction is issued, Defendants may continue failing to properly process claims or secure their information systems, and Defendants may continue to act unlawfully, as set forth in this Complaint. Further, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Federal Rule of Civil Procedure 23(b)(2).

## **CLAIMS FOR RELIEF**

### **COUNT I: NEGLIGENCE**

51.     Plaintiffs reallege the allegations above as if fully set forth herein.

52.     At all times relevant hereto, Defendants owed Plaintiffs and Class Members a duty to act with reasonable care to ensure the continuity of their Defendants' networks and transactional services, and to ensure that their revenue cycle services would be adequately performed, including by way of timely and accurate claims processing. Defendants assumed this obligation and utilized their information systems in the performance of their services on behalf of Plaintiffs and Class Members.

53.     Among these duties, Defendants were expected to provide claims processing and revenue cycle services to Plaintiffs using safe and secure computer systems and networks.

54.     Defendants owed a duty of care to not subject Plaintiffs and Class Members to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

55.     Defendants knew or should have known of the vulnerabilities of their data security systems and the importance of adequate security. Defendants knew or should have known about numerous well-publicized data breaches.

56.     Defendants knew or should have known that their data systems and networks did not adequately safeguard the claims processing and revenue cycle services.

57.     Only Defendants were in the position to ensure that their systems and protocols were sufficient to protect Plaintiffs and Class Members information.

58.     Defendants' duties extended to protecting Plaintiffs and the Class Members from the foreseeable risk of foreseeable criminal conduct of third parties, including because Defendants' own actions and omissions exposed Plaintiffs and similarly situated parties to the harm flowing from the disruption of routine, timely processing of patients' insurance claims and insurers' payments for services.

59.     Defendants breached their duties to Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the claims processing and revenue cycle services, in deviation from industry rules, regulations, and practices.

60.     Because Defendants knew that a breach of their systems could damage numerous individuals, including Plaintiffs and Class Members, Defendants had a duty to adequately protect their data systems.

61.     Plaintiffs' and Class Members' willingness to entrust Defendants with their processing needs was predicated on the understanding that Defendants would take adequate security precautions.

62.     Defendants also had independent duties under state and federal laws that required Defendants to reasonably safeguard Plaintiffs' and Class Members' PHI/PII and promptly notify them about the Data Breach.

63.     Defendants' willful failure to abide by their duties was wrongful, reckless and/or grossly negligent in light of the foreseeable risks and known threats.

64.     As a proximate and foreseeable result of Defendants' grossly negligent conduct, Plaintiffs and Class Members have suffered damages and are at imminent risk of additional harm and damages.

65.     The law further imposes an affirmative duty on Defendants to timely disclose the unauthorized access and failure to be able to process claims corrected or timely.

66.     Further, explicitly failing to provide timely and clear notification of the Data Breach to Plaintiffs and Class Members, Defendants prevented Plaintiffs and Class Members from taking meaningful, proactive steps to secure processing needs which caused damages to Plaintiffs.

67.     Defendants' failures—including, but not limited to failure to adopt, implement, and maintain security measures to protect their information systems—directly and proximately caused the harm suffered by Plaintiffs and the Class Members. Defendants' failure to exercise reasonable care in adopting, implementing, and maintaining appropriate security measures to protect their

information systems resulted in the loss of Change's mission-critical services, and was the proximate result of overdue payments, interest accumulation, and other financial harm to Plaintiffs and Class Members.

68.     Defendants' wrongful actions, inactions, and omissions constituted and continue to constitute negligence.

69.     The damages Plaintiffs and Class Members have suffered, as alleged above, and will continue to suffer were and are the direct and proximate result of Defendants' negligent conduct.

70.     Additionally, 15 U.S.C. § 45 (FTC Act, Section 5) prohibits "unfair […] practices "in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect private information like the processing of confidential claims. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

71.     Defendants violated 15 U.S.C. § 45 by failing to use reasonable measures and by not complying with applicable industry standards, as described in detail herein.

## COUNT II: BREACH OF IMPLIED CONTRACT

72.     Plaintiffs reallege the allegations above as if fully set forth herein.

73.     Through their course of conduct, Defendants, Plaintiffs and Class Members entered implied contracts for Defendants to implement data security and data processing functions adequate to safeguard and protect Plaintiffs' and Class Members' claims processing and revenue cycle services materials.

74.    Defendants required Plaintiffs and Class Members to provide and entrust their claims processing and revenue cycle services materials as a condition of obtaining Defendants' services.

75.    Defendants solicited and invited Plaintiffs and Class Members to provide their claims processing and revenue cycle service materials as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their claim processing materials to Defendant.

76.    Plaintiffs and Class Members provided and entrusted their claims processing and revenue cycle services materials to Defendant. In so doing, Plaintiffs and Class Members entered into implied contracts with Defendants by which Defendants agreed to ensure that Plaintiffs processing materials would not be defective or compromised.

77.    A meeting of the minds occurred when Plaintiffs and Class Members agreed to, and did, provide their claims processing and revenue cycle services materials to Defendant, in exchange for, among other things, the protection of their materials.

78.    Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendant.

79.    Defendants' breaches caused economic and non-economic harm.

**COUNT III: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

80.    Plaintiffs reallege the allegations above as if fully set forth herein.

81.    Contracts have an implied covenant of good faith and fair dealing. This implied covenant is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

82.     Plaintiffs and Class Members have complied with and performed all conditions of their contracts with Defendants.

83.     Defendants breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices and to process claims and services in a timely and safe manner as a result of the Data Breach.

84.     Defendants knew or should have known of the vulnerabilities of the systems that were exploited in the Data Breach.

85.     Defendants acted in bad faith and/or with malicious motive in denying Plaintiffs and Class Members the full benefit of their bargains as originally intended by the parties, thereby causing them injury in an amount to be determined at trial.

## COUNT IV: BREACH OF FIDUCIARY DUTY

86.     Plaintiffs reallege the allegations above as if fully set forth herein.

87.     In light of the special relationship between Defendants and Plaintiffs and Class Members, whereby Defendants became the guardian of Plaintiffs' and Class Members' claim processing materials, Defendants became a fiduciary by their undertaking and guardianship of the materials to act primarily for Plaintiffs and Class Members.

88.     Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of their relationship with Class Members—in particular, to keep their claims processing and revenue cycle service materials secure.

89.     Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period of time.

90.     Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' claims processing and revenue cycle service materials.

91.     Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

92.     As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer injuries.

## COUNT V: UNJUST ENRICHMENT

93.     Plaintiffs reallege the allegations above as if fully set forth herein. This Count is pled in the alternative to the Breach of Contract Count above.

94.     Upon information and belief, Defendants fund their data-security measures entirely from their general revenue, including payments made by or on behalf of Plaintiffs and Class Members.

95.     As such, a portion of the payments made by or on behalf of Plaintiffs and Class Members is to be used to provide a reasonable level of data security, and the amount of each payment allocated to data security is known to Defendants.

96.     Plaintiffs and Class Members conferred a monetary benefit to Defendant. Specifically, they purchased goods and services from Defendants and/or their agents and provided Defendants with their claims processing and revenue cycle service materials. In exchange, Plaintiffs and Class Members should have received from Defendants the goods and services that were the subject of the transaction and have their processing and service materials protected with adequate data security.

97.     Defendants knew that Plaintiffs and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the claims processing and revenue cycle service materials of Plaintiffs and Class Members for business purposes.

98.     Defendants enriched themselves by saving the costs it reasonably should have expended in data-security measures to secure Plaintiffs' and Class Members' claims processing materials. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendants instead calculated to increase their own profits at the expense of Plaintiffs and Class Members.

99.     Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendants failed to implement appropriate data management and security measures mandated by industry standards.

100.     If Plaintiffs and Class Members knew that Defendants had not reasonably secured their claims processing materials, they would not have agreed to provide their PHI/PII to Defendants.

101.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

102.     Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that it unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendants' services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, and each member of the proposed Class respectfully request that the Court enter judgment in their favor and for the following specific relief against Defendants as follows:

1.      That the Court declare, adjudge, and decree that this action is a proper class action and certify each of the proposed Class and/or any other appropriate Class under Fed. R. Civ. P. 23 (b)(1), (b)(2), and/or (b)(3), including the appointment of Plaintiffs' counsel as Class Counsel;

2.      For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

3.      That the Court enjoin Defendants, ordering it to cease and desist from similar unlawful activities;

4.      For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

5.      For injunctive relief requested by Plaintiffs, including but not limited to injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

6.      For prejudgment interest on all amounts awarded, at the prevailing legal rate;

7.      For an award of attorney's fees, costs, and litigation expenses, as allowed by law; and

8.      For all other Orders, findings, and determinations identified and sought in this Complaint.

## JURY DEMAND

Plaintiffs, individually and on behalf of the Class, hereby demand a trial by jury for all issues triable by jury.

Dated: April 22, 2024.

Respectfully submitted,

By:

/s/ *Korey Nelson*
Korey Nelson (LA Bar No. 30002)
Amanda Klevorn (LA Bar No. 35193)
Claire Bosarge Curwick (LA Bar No. 39809)
Natalie Earles (LA Bar No. 40352)
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
knelson@burnscharest.com
aklevorn@burnscharest.com
ccurwick@burnscharest.com
nearles@burnscharest.com
phone: (504) 799-2845

Warren Burns (to be admitted *pro hac vice*)
Laura Soundy Seggerman (to be admitted *pro hac vice*)
**BURNS CHAREST LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
wburns@burnscharest.com
lseggerman@burnscharest.com
phone: (469) 904-4550

Derrick Earles (LA Bar No. 29570)
**LABORDE EARLES**
1901 Kaliste Saloom Road
Lafayette, Louisiana 70508
digger@onmyside.com
phone: (337) 223-9925

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2024, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's electronic filing system.

Dated: April 22, 2024.                    Respectfully submitted,

                                          */s/ Korey Nelson*
                                          Korey Nelson